IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KENNETH ADAMS                    :

   v.                              :  Civil Action No. DKC 08-1601

ARTHUR WALLENSTEIN, et al.       :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination and retaliation case is a motion for summary judgment filed by Defendant Arthur Wallenstein. (ECF No. 52). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion will be granted.[1]

## I. Background

### A. Factual Background

Unless otherwise stated, the facts herein are uncontroverted.

On April 5, 2004, Montgomery County hired Plaintiff Kenneth Adams to work as a correctional officer at the Montgomery County Detention Center ("MCDC"). After completing an initial training

---

[1] Also pending is a motion to withdraw filed by one of Adams' attorneys, Clarence Connelly, Jr. (ECF No. 66). That motion will also be granted.

class, Adams was placed on the 6:30 am to 3:00 pm shift. For his first two weeks on duty, he was paired with a senior officer. After that time, he worked various posts on his own.

Starting in May 2004, Adams received monthly evaluations from his supervisor, Lieutenant A. Gomes. Initially, these evaluations were favorable. His evaluations for the months of April and May 2004, for instance, both indicated that he had not been absent or late to work and instructed him to "keep up the good work." (ECF No. 52-4, Exs. 2A & 2B, at 1-2). In his evaluation for the month of June, however, Lt. Gomes noted that Adams had taken a day of sick leave and informed Adams to "watch his use of sick leave." (*Id.*, Ex. 2C, at 3). Nevertheless, Adams took eight hours of sick leave in July and eight more hours in August. After Adams took an additional 16 hours in October, Lt. Gomes spoke with Adams again about his use of sick leave; the evaluation indicates that Adams assured Gomes he would improve. Adams then used 8 more sick leave hours in November 2004 and 18 more hours in December. In his December evaluation, Adams was once more cautioned that he was a probationary employee who could face discipline (including extended probation or termination) if he continued to use too much sick leave. Other than issues pertaining to sick leave, Gomes' evaluations were generally positive in 2004.

In addition to cautioning Adams during his December review, Lt. A. Gomes sent Adams a letter dated December 23, 2004. The letter advised Adams:

> [Y]ou have been employed with Detention Services, namely MCDC since April 5th, 2004 [and] in that span of time to the present day you have used 61 hours of sick leave. That is almost 8 hours for every thirty (30) days. This is unacceptable for a new employee. Officer Adams[,] I have talked to you about your use of sick leave and if it does not improve you will be subject to extension of your probation status or possible termination.

(ECF No. 52-5, Ex. 3).

In 2005, Adams continued to accrue absences. Thus, in a memorandum dated February 22, 2005, Lt. Gomes informed Adams that, as a result of his absences, he had "met the criteria for two or more of the Absence Categories as defined in section (d) of Appendix XI of the Collective Bargaining Agreement." (ECF No. 52-6, Ex. 6, at 1). In particular, Adams had seven or more absences in a six-month period and three or more unscheduled absences on a Friday, Saturday, or Sunday during the preceding six months. The memorandum urged Adams to improve his performance and informed him that he would be placed in a disciplinary track. Adams signed that memorandum. In a letter to Deputy Warden James Jones dated the same day, Lt. Gomes reported the numerous absences, recommended that Adams'

3

probation be extended, and recommended termination in the event his "record" did not improve. (ECF No. 52-7).

In another memorandum dated March 10, 2005, Director of the Montgomery County Department of Correction and Rehabilitation ("MCDCR") Arthur Wallenstein and Human Resources Manager Ivonne Gutiérrez-Anglin informed Adams that his probation period would be extended by six months. (ECF No. 52-8). The letter explained that the "primary reason" for Adams' additional probation was his "having missed work and not being able to obtain acceptable training and experience during your probationary period." (*Id.* at 1).

In September 2005, Adams received an evaluation of his performance since the date he was hired from Lt. Gomes. That evaluation was largely positive, indicating that Adams met expectations in most areas of performance. The notable exception was "Expectation 11: Maintains regular and punctual attendance as specified in Personnel Regulations and the Collective Bargaining Agreement." (ECF No. 52-9, Ex. 7, at 4). In that area, Adams' evaluation was marked "Does Not Meet Expectations." (*Id.*). Gomes wrote:

> Pvt. Adams['] probation was extended for not meeting the attendance requirements during his first year. Since his probation was extended he has improved dramatically. Recently he has missed 4 days do [sic] to a verified illness. In order to maintain this

> job he will need to make sure he can come to work more consistently. This supervisor will continue to monitor his attendance record.

(*Id.*). Gomes also commented that Adams needed to "vastly improve his attendance record," and warned Adams during the evaluation that "he must come to work or he will eventually work himself out of this job." (*Id.* at 6). Portions of Adams' deposition testimony indicate that – despite the many warnings – Adams took additional sick leave in August and September 2005. (The parties have not provided, however, any records of his absences after February 2005.)

On September 23, 2005, Adams was sent a memorandum placing him on administrative leave with pay, effective immediately, pending "termination during probation." (ECF No. 52-10, Ex. 8). Adams' termination letter, which followed on October 5, 2005, explained that he had "failed to achieve a satisfactory level of performance during [his] probationary period" because of "abuse of leave" and "coming into work late." (ECF No. 52-11, Ex. 9). His termination was effective October 28, 2005.

### B. Procedural Background

On March 5, 2007, Adams filed a charge of discrimination with the Montgomery County, Maryland Office of Human Rights and the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 52-13). In that charge, Adams contended that he had faced

5

discrimination "because of [his] color and race (Black) and in retaliation for complaining about sexually explicit emails in violation of Title VII" of the Civil Rights Act of 1964 ("Title VII"). (*Id.*). The charge noted four particular events: (1) his extended probationary period in April 2005; (2) the "inappropriate" email he received in July 2005; (3) a comment made by a second line supervisor in "September or October 2005"; and (4) his discharge on October 27, 2005. (*Id.*). The EEOC dismissed Adams' claim and issued a right-to-sue letter on March 14, 2007. (ECF No. 52-15).

On June 13, 2007, Adams filed suit against Wallenstein and Gino Renne, president of Adams' union, in the Circuit Court for Montgomery County. (ECF No. 1). He then filed an amended complaint on May 12, 2008 and finally served the amended complaint on Wallenstein on May 22, 2008. (*Id.* ¶ 3). Wallenstein removed the amended complaint to this court on June 19, 2008. (*Id.*).

The complaint asserted three claims against both defendants: (1) race-based discrimination and retaliation claims under Title VII; (2) disability-based discrimination under the Americans with Disabilities Act ("ADA"); and (3) violation of the Family Medical Leave Act ("FMLA"). (ECF No. 2 ¶¶ 16-28). In count four, Adams asserted a claim for breach of duty of fair

6

representation against Renne alone. (*Id.* ¶¶ 29-32). Because he was never served, Renne was dismissed from the case without prejudice on March 3, 2009, rendering count four effectively moot. (ECF No. 25).

After discovery closed, Wallenstein moved for summary judgment on November 30, 2010. (ECF No. 52). Adams opposed on February 3, 2011 (ECF No. 57) and Wallenstein replied shortly thereafter (ECF No. 59).

**II. Standard of Review**

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v.*

*Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

**III. Analysis**

    **A. Title VII**

In count one of his complaint, Adams assets claims under Title VII. Adams argues that, as an African American, he was "singled out, reprimanded, and terminated for the same actions that similarly situated white officers were not." (ECF No. 57-1, at 4). He states that he was (1) unduly punished for taking time off and (2) often reassigned to the same post after an altercation with an inmate (in contravention of the allegedly standard policy of reassigning officers to a different post). He also maintains that he was retaliated against after he complained about a sexually explicit email he received from a supervisor.

Wallenstein contends that these claims were untimely brought. "Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F.Supp.2d 587, 597 (D.Md. 2000). In the usual case, claimants under Title VII must file a charge of discrimination within 180 days of the alleged discriminatory practice. *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (explaining timing requirements under Title VII). But a "300-day period, rather than the 180-day period, applies where, as here, state law also proscribes the alleged employment discrimination and the plaintiff files with a state or local employment discrimination agency either before filing with the EEOC, or concurrently therewith." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004). Put differently, claimants in a "deferral state" such as Maryland have 300 days to file their Title VII. *See Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F.Supp.2d 658, 662 (D.Md. 2007); *see also Mayers v. Wash. Adventist Hosp.*, 131 F.Supp.2d 743, 746 (D.Md. 2001) (discussing both Title VII and ADA claims).

In this case, the last possible date of race-based discrimination was October 28, 2005, the date of Adams' termination. Thus, Adams needed to file a charge of

discrimination with the EEOC no later than August 24, 2006. Instead, he waited over 500 days before he filed his charge on March 13, 2007. Because "a plaintiff must first *timely* file a charge with the EEOC before commencing a suit," Adams' Title VII claims may not proceed. *Knickman v. Prince George's Cnty.*, 187 F.Supp.2d 559, 564 (D.Md. 2002) (emphasis added).

Adams argues that his claim must be timely because "the charge was processed [by the EEOC] and the right to sue letter was issued. The Equal Employment Opportunity Commission does not accept charges that are not timely filed." (ECF No. 57-1, at 3). There is no authority to support Adams' argument that the EEOC issues right-to-sue letters for only timely filed claims. A right-to-sue letter only signals that the EEOC is finished with its involvement in a particular proceeding; it does not definitively establish that the claim was timely brought. *Cf. McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 214 (2$^d$ Cir. 2006) ("[A] right-to-sue letter enables a private suit only if it is issued in connection with an administrative charge that is timely filed."); *see also, e.g.*, *Karim v. Staples*, 210 F.Supp.2d 737, 749 (D.Md. 2002) (finding claims were time-barred, even where agency addressed their merits and subsequently issued a right-to-sue letter). In fact, the right-to-sue letter itself undermines Adams' argument, as

the EEOC was merely "unable to conclude that the information obtained establishes violations of the statutes." (ECF No. 52-15, Ex. 13, at 1). The EEOC made "[n]o finding as to any other issues that might be construed as having been raised by [the] charge." (*Id.*). Thus, the right-to-sue letter does not excuse Adams' untimeliness.

Summary judgment will be entered on count one in favor of Wallenstein.

**B.   ADA**

In count two of his complaint, Adams contends that he faced discrimination because of his allergies, which he characterizes as a disability. Wallenstein argues that Adams' ADA claim suffers from two administrative defects: (1) a failure to file a timely charge, and (2) a failure to present these claims at the administrative level. Unlike the failure to file a *timely* charge, the failure to exhaust administrative remedies actually deprives a federal court of subject matter jurisdiction. *Jones*, 551 F.3d at 300-301 & n.2. Therefore, the court must consider the exhaustion matter first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998).

Because the ADA incorporated the procedural requirements of Title VII, a plaintiff must exhaust his administrative remedies as to those claims before filing a complaint. *See* 42 U.S.C.

§ 12117(a).  "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained" in a subsequent lawsuit.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).  Civil suits cannot present entirely new theories of liability not found within the initial EEOC complaint.  Thus, a claim will generally be barred if the EEOC charge alleges discrimination on one basis while the civil litigation advances a claim of discrimination on a separate basis.  *See Talbot v. U.S. Foodservice, Inc.*, 191 F.Supp.2d 637, 640-41 (D.Md. 2002) (granting summary judgment against an employee who alleged race discrimination in his EEOC charge but brought suit under both Title VII and the ADA).

This present ADA claim is nowhere to be found in the initial charge.  There is no mention of Adams' allergies (or any other disability) in the EEOC charge.  Indeed, Adams only checked the "race," "retaliation," and "color" boxes on the charge, leaving the "disability" box blank.  In his opposition to the motion for summary judgment, Adams does not even attempt to argue that the ADA claim fell within the scope of his initial EEOC charge or any subsequent investigation.  Lacking any

exhaustion, Adams' ADA claim must be dismissed for lack of subject matter jurisdiction.[2]

**C. FMLA**

Finally, Adams asserts a claim under the FMLA against Wallenstein.[3] Specifically, Adams avers that he and his minor child[4] both suffer from severe allergies that required him to take FMLA leave. He argues that his probation was extended, he was reprimanded, and he was ultimately terminated because he requested and took that leave.

Congress passed the FMLA as an attempt "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, . . . to promote national interests in preserving family integrity," and

---

[2] Even if the court did have subject matter jurisdiction over the ADA claim, it would face the same timeliness problems that were discussed in connection with the Title VII claim. *See, e.g.*, *Walton v. Guidant Sales Corp.*, 417 F.Supp.2d 719, 722 (D.Md. 2006) (applying 300-day filing period requirement in ADA case).

[3] One presumes that Wallenstein is sued in his official capacity, as public employees are not amenable to suit under the FMLA in their personal capacities. *Bosse v. Baltimore Cnty.*, 692 F.Supp.2d 574, 583 (D.Md. 2010).

[4] Although Adams also justified his absences by citing the illnesses of his minor child, the evidence in the record largely speaks to Adams' illnesses. Nevertheless, to the extent Adams continues to seek relief based on leave he took to take care of his child, those claims would fail for the same reasons described below.

"to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."  29 U.S.C. § 2601(b)(1)-(2); *see also Babcock v. BellSouth Adver. & Publ'g Corp.*, 348 F.3d 73, 76 (4th Cir. 2003). Causes of action relying upon the Act generally fall into one of two broad categories.  In the first type of claim, called an "interference" or "entitlement" claim, an employee contends that his employer has prevented or otherwise interfered in the *prescriptive* rights the Act sets forth (*i.e.*, 12 weeks of leave when an employee suffers from a serious medical condition). *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).  The second type of claim, generally termed a "discrimination" or "retaliation" claim, rests upon the Act's *proscriptive* provisions, which bar retaliation or discrimination of employees who exercise their FMLA rights.  *Id.; see also Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-96 (4th Cir. 2009).  "A retaliation claim under the FMLA differs from an interference claim under the FMLA in that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent."  *Bosse*, 692 F.Supp.2d at 588.

Although neither Adams' complaint nor his submissions on summary judgment make it explicit, Adams would seem to assert a retaliation claim. Absent direct evidence, "FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 800-806 (1973)." *Yashenko*, 446 F.3d at 550-51; *accord Glunt v. GES Exposition Servs., Inc.*, 123 F.Supp.2d 847, 871 (D.Md. 2000). Consequently, an employee must first make out a prima facie case by demonstrating "(1) that [he] engaged in protected activity, (2) that the employer took adverse action, and (3) that the adverse action was causally connected to the plaintiff's protected activity." *Jordan v. Radiology Imaging Assocs.*, 577 F.Supp.2d 771, 786 (D.Md. 2008). If the employee establishes a prima facie case, the employer must offer a non-retaliatory explanation for the adverse action. *Id.* If the employer does so, the burden then shifts back to the employee to establish "that the employer's proffered explanation is a pretext for FMLA retaliation." *Id.*

A threshold problem with Adams' retaliation claim is that it is not clear that he even held any rights under the FMLA. Unless an employee is afflicted with an "FMLA-qualifying condition" – that is, a "serious health condition," 29 U.S.C. §

15

2611 – he would not have any FMLA rights. *Rhoads v. FDIC*, 257 F.3d 373, 385 (4th Cir. 2001). The record here does not contain much evidence speaking to the seriousness or severity of Adams' condition. Adams simply states that he sometimes saw a doctor for his allergies; that the allergies caused headaches, a stuffy nose, and runny eyes; and that he sometimes treated his allergies with over-the-counter medications. This type of vague evidence would seem to fall well short of demonstrating the requisite incapacitation to invoke FMLA leave. *See, e.g.*, *Taylor v. Autozoners, LLC*, 706 F.Supp.2d 843, 850 (W.D.Tenn. 2010) ("Incapacitation for the purposes of the FMLA does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. (quotation marks omitted)); *Bond v. Abbott Labs.*, 7 F.Supp.2d 967, 974 (N.D.Ohio 1998) ("Determining whether an illness qualifies as a serious health condition for purposes of the Family and Medical Leave Act is a legal question that a plaintiff may not avoid simply by alleging it to be so."); *but see Krenzke v. Alexandria Motor Cars, Inc.*, 289 F.App'x 629, 634-35 (4th Cir. 2008) (finding plaintiff presented enough evidence of "serious medical condition" on summary judgment where she established multiple doctors visits and time missed from work, even without offering a particular diagnosis).

If Adams lacked a serious medical condition, his leave would not have been "FMLA leave," and the adverse actions he alleges would not have stemmed from a protected activity. *Walker v. Gambrell*, 647 F.Supp.2d 529, 540 (D.Md. 2009) ("[T]he FMLA only protects an employee from retaliation for an activity protected under the FMLA itself.").

But even if one assumes that Adams did suffer from a serious medical condition, his claim fails at the first step: protected activity. There is no indication that Adams ever requested or took any form of *FMLA* leave. Although he might have taken time off work because of illness, there is no indication he exercised his rights under the Act (as opposed to simply taking time off). For one, much of Adams' time off work was taken when he was ineligible for FMLA leave. *See* 29 U.S.C. § 2611(2)(A)(ii); *see also Rockwell v. Mack Trucks, Inc.*, 8 F.Supp.2d 499, 502 (D.Md. 1998) (an employee must work at least 1,250 hours with his employer during a twelve-month period prior to the adverse action). Because an employee must work for at least one year before becoming eligible for FMLA leave, only the leave Adams took after April 4, 2005 could have possibly been FMLA leave. Adams has provided no evidence that this specific FMLA-eligible leave time related to a serious medical condition. Indeed, Adams does not remember why he took that leave. Thus,

to the extent his employer retaliated against him for taking leave, the leave was either (a) leave that was not FMLA by definition or (b) leave of some undefined nature.

Moreover, Adams has not established that he made any request for or otherwise took FMLA leave, as there is no indication that he hinted to anyone at MCDCR that he was taking time off because of an FMLA-related condition, that is, a *serious* medical condition. *See, e.g.*, *Fischer v. NYC Dep't of Educ.*, 666 F.Supp.2d 309, 318 (E.D.N.Y. 2009) (finding employee's request for leave form did not place employer on notice of request for time off for serious medical condition and consequently did not constitute protected activity underlying retaliation claim); *Brown v. The Pension Boards*, 488 F.Supp.2d 395, 410 (S.D.N.Y. 2007) (finding that employee did not provide notice by simply calling in sick and providing vague doctor's note, defeating employee's retaliation claim); *Ney v. City of Hoisington, Kansas*, 508 F.Supp.2d 877, 887 (D.Kan. 2007) (finding no protected activity where employee did not fill out paperwork requesting FMLA leave); *Henegar v. Daimler-Chrysler Corp.*, 280 F.Supp.2d 680, 688 (E.D.Mich. 2003) ("[T]he Plaintiff must show that he availed himself of a protected right under the FMLA by notifying his employer of his need to take leave for a serious health condition."). He did not complete any of the

required paperwork for requesting FMLA leave. Rather, viewing the record in the light most favorable to Adams, he simply called in and asked to be "put down for sick leave." He sometimes mentioned to his supervisors that he might take sick leave if his allergies became "severe," which meant to him that he had headaches and a runny or stuffy nose. His doctor might have faxed a note to MCDCR, but it is unclear on the present record what such a note would have said and how often such notes were sent. Such acts were insufficient to place Adams' employers on notice that he was taking FMLA leave because, assuming the existence of a serious medical issue, Adams' acts did not convey the severity of the condition or the real nature of the medical problem. Even though an employee need not "expressly assert rights under the FMLA or even mention the FMLA" to claim its protections, *Dotson*, 558 F.3d at 295,[5] simply calling in "'sick' is insufficient to put an employer on notice that FMLA leave may be needed," *Rodriguez v. Smithfield Packing*

---

[5] *Dotson* clarifies the degree of notice to the employer that must be shown for a retaliation claim to proceed. There, the Fourth Circuit rejected the argument that the employee must "specifically invok[e] an FMLA right," but does support the idea that an employer must at least be aware of the employee's "need for leave for an FMLA-related reason." *Dotson*, 558 F.3d at 295. In other words, the Fourth Circuit simply applied the same notice standards to both retaliation and interference cases. *Id.*

*Co., Inc.*, 545 F.Supp.2d 508, 518 (D.Md. 2008); *accord Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 785-86 (8th Cir. 2009); *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008). Because he never invoked the protections of the Act in any sense – either explicitly or implicitly – Adams did not engage in protected activity when he took his leave. As a result, Adams is unable to make out a prima facie case of retaliation.

Summary judgment will be granted for Wallenstein on count three.

**IV. Conclusion**

For the foregoing reasons, Wallenstein's motion for summary judgment will be granted. In addition, the motion to withdraw filed by Clarence Connelly, Jr. will be granted. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge